IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER W. OLIVER,

                Petitioner,

      vs.

PATRICK EATON, Warden, Sierra
Conservation Center,[1]

              Respondent.

No. 2:20-cv-00972-JKS

MEMORANDUM DECISION

Christopher W. Oliver, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Oliver is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at Sierra Conservation

Center.  Respondent has answered, and Oliver has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On September 9, 2014, Oliver, along with co-defendants Michael Roessler and Justin

Wilson, was charged with first-degree murder (Count 1), conspiracy to commit murder (Count

2), and assault with a deadly weapon or with force likely to cause great bodily injury (Count 6)[2]

after Oliver brought Roessler a gun, which Roessler used to shoot and kill Michael Lawrence, a

man with whom Roessler had earlier been involved in an argument.  The information alleged as

to Counts 1 and 2 that a principal was armed with a firearm during the commission of the

offense.  Oliver pleaded not guilty, denied the enhancement allegations, and proceeded to a jury

---

[1]     Patrick Eaton is substituted for Kathleen Allison as Warden, Sierra Conservation Center.  FED. R. CIV. P. 25(d).

[2]     The remaining charges were alleged solely against the co-defendants.

trial.[3]  On direct appeal of his conviction, the California Court of Appeals recounted the

following facts underlying the charges against Oliver and the evidence presented at trial:

> In June 2013, Lawrence lived with his wife, E., and two daughters in a small neighborhood located in the rural outskirts of Manteca.  A fence with an electronic sliding gate separated the front yard and driveway from the main road.  A short distance down that road, situated on the San Joaquin River, was the Turtle Beach Resort.
>
> On June 22, Lawrence got home from work around 4:00 p.m. and began washing his car in the driveway.  He planned to bring his family to Turtle Beach later in the afternoon to meet up with a friend, M., and his family.  As Lawrence washed the car, E.'s sister and brother-in-law, A. and G., stopped by the house.  A. was driving a small black SUV.  Their neighbor, J., was also in the vehicle.  After some discussion, E. and their youngest daughter got into the SUV and went to Turtle Beach with them while Lawrence finished washing the car.  M. and his family were already at Turtle Beach when A.'s carload arrived. Lawrence arrived on a dirt bike about an hour later.
>
> M. barbequed and most of the adults noted above drank alcohol while at Turtle Beach.  At some point, Lawrence got on his dirt bike wearing a backpack and rode to a bar about a mile away to buy some more beer.  When he got there, Roessler and Wilson were sitting at the bar.  They were in their 20s and arrived at the bar on Harley Davidson motorcycles.[FN3]  Lawrence, who was in his early 50s, asked the bartender for a six-pack of Corona to go.  As the bartender retrieved a six-pack to make the sale, Roessler told Lawrence it would be cheaper to buy beer at a store.  Roessler then said to Wilson, "nothing but fags and molesters live around here."  Overhearing the comment, Lawrence responded: "I live around here."  Roessler said: "No offense to you . . . .  [T]hat's just what lives around here."  Lawrence paid for the beer, put it in the backpack, and returned to his family and friends on the dirt bike.
>
> > FN3.   Wilson's girlfriend was expected to give birth to their first child that day, so Wilson and Roessler went "bar hopping" to celebrate.
>
> Lawrence was upset when he got back to Turtle Beach.  After telling his friend M. what had happened at the bar, the two got on the dirt bike and rode to Lawrence's house.  E. believed her husband planned to return to the bar and ran after the bike.  A. believed the same and got into the SUV to pick up her sister and continue the pursuit.  J. also joined them.  When Lawrence and M. got to the house, Lawrence parked the bike in the garage.  As they got into Lawrence's car to return to the bar, A. pulled up in the SUV and told them to get in.  She then drove the fivesome to the bar herself.
>
> At the bar, Lawrence went in alone while the rest of the group waited outside.  Lawrence approached Roessler, who was still seated at the bar with Wilson, and asked: "Did you call me a faggot?"  Additional words were exchanged, after which Roessler and

---

[3]      Roessler and Wilson were tried in a separate proceeding.

Wilson followed Lawrence outside.  Wilson believed Roessler and Lawrence were going to fight and stood off to the side as "back up."  Other bar patrons also came out hoping to see a fight.  When Wilson got outside, J. approached him quickly and said: "Do you got a problem?"  Wilson responded that the problem was between Roessler and Lawrence.  Wilson and J. then watched as Roessler and Lawrence argued in front of the bar, squaring up and "circling around" each other as they did so.  At the same time, E. and A. were yelling at Roessler.  E. pushed him away from her husband and A. yelled, among other things, "he's older than you" and, "did anyone not teach you to respect your elders[?]"  A couple minutes after it began, the confrontation between Roessler and Lawrence in front of the bar ended with them shaking hands.  Roessler and Wilson went back inside the bar and Lawrence's group went back to Turtle Beach.

At this point in the narrative, timing begins to become important to [Oliver's] sufficiency of the evidence claims.  [Oliver] arrived at the bar at around 8:30 p.m.  He and Roessler were close friends.  While Wilson had only recently made [Oliver's] acquaintance, the three had ridden motorcycles together on two previous occasions and Wilson had attempted to buy a gun from [Oliver] earlier in the day.  About an hour before [Oliver's] arrival, Roessler called him and said he called someone at the bar a "chomo," by which he meant, "a gay child molester."  He also told [Oliver] where he and Wilson were drinking and asked him to bring a gun if he decided to join them.[FN4]

> FN4.   According to [Oliver], the gun belonged to Roessler and [Oliver] was cleaning and repairing it for him.

It is unclear whether this phone call occurred before or after Lawrence returned to the bar to confront Roessler.  However, after that confrontation, back inside the bar, a couple of the bar's patrons suggested Lawrence might come back with more people.  According to Wilson, this "seemed to rile up" Roessler, who was already "frustrated" by the incident and "irritated" that one of the women had pushed him; Wilson believed these patrons were just "stirring the pot."  Several minutes later, Roessler told Wilson to call [Oliver] to ask whether he would be bringing a gun.  During that conversation, Wilson told defendant about the confrontation with Lawrence.[FN5]

> FN5.   The cell phone records do not indicate a call between Wilson's cell phone and [Oliver's] cell phone during this time period, but rather one at 5:26 p.m., lasting only six seconds, and one at 8:43 p.m., lasting only five seconds.  However, 2 phone calls were made between Roessler's cell phone and [Oliver's] cell phone, one at 7:31 p.m., lasting 1 minute, 8 seconds, and another at 7:41 p.m., lasting 6 minutes, 21 seconds.  This evidence can be harmonized with Wilson's testimony if the first call between Roessler's cell phone and [Oliver's] cell phone, at 7:31 p.m., was the call Roessler made and during which he told [Oliver] about insulting Lawrence, and the second call between these phones was Wilson's call to [Oliver] during which he told [Oliver] about the confrontation.  Under this view of the evidence, it is possible the first call was made after the initial interaction with Lawrence and the second call was made after the subsequent

3

confrontation, leaving only 10 minutes between incidents with Lawrence. However, as mentioned, the bar and Turtle Beach were only about one mile apart. It is also possible both calls were made after the confrontation, and during the 10 minutes between the calls Roessler was becoming more agitated about the situation by the bar patrons' speculation about Lawrence coming back with more people. Either way, viewing the evidence in the light most favorable to the verdict, as we must, [Oliver] was aware of the confrontation before 8:00 p.m.

At 7:56 p.m., [Oliver] sent Roessler a text message saying: "Try to push start this bike will be their[.]"[FN6]  At 8:03 p.m., [Oliver] sent Roessler another text message saying: "You want some heat[?]"  Roessler responded: "Ya[.]"  [Oliver] replied: "No[.]"  Roessler responded: "No what[?]"  [Oliver] replied: "You ya what that mean no[.]"  Then, at 8:10 p.m., [Oliver] sent Roessler another text message asking: "Want me to bring a gun for you[?]"  Roessler did not respond. A couple minutes later, [Oliver] sent Wilson a text message asking: "You still out their[?]"  Wilson responded: "Yup waitin on u[.]"  [Oliver] asked: "Does he want me to bring him a gun[?]"  Wilson responded: "Yeah[.]"  [Oliver] replied: "Ok on the way[.]"  At 8:22 p.m., [Oliver] again messaged Wilson saying he was on his way, followed at 8:25 p.m. by: "On 99 in manteca" and "5 min[.]"  One minute later, [Oliver] messaged Roessler with: "Be their in 5 min tuck the car[.]"

> FN6.  Aside from adding ending punctuation, we provide the various text messages sent between the parties verbatim.

Around the time the bar patrons were talking about Lawrence coming back, Roessler also called another friend, David Delgado, and asked him to come down to the bar. Delgado drove to the bar in his grandmother's van and arrived shortly before [Oliver] got there. When [Oliver] arrived, he gave Roessler a loaded .45-caliber handgun. Wilson overheard [Oliver] and Roessler talking about the confrontation with Lawrence. A short time later, Roessler asked Wilson to borrow his motorcycle so that [Oliver] could ride Roessler's motorcycle. Wilson agreed, claiming initially in his testimony that he did not know where they intended to go, but then acknowledging they said, "they were going to go down there," meaning into the small neighborhood between the bar and Turtle Beach, "to go see if they're down there." Wilson also acknowledged seeing a portion of the butt of a handgun protruding from Roessler's pocket as they were leaving.

Meanwhile, as mentioned, after leaving the bar following the confrontation with Roessler, Lawrence and his group returned to Turtle Beach. M. and his family left shortly after they got back from the bar. The rest of the group decided to go to Lawrence's house to continue drinking and socializing there. But first, they drove to a store in Manteca to buy food and more alcohol. On the way to the store, they drove past the bar. A. saw Roessler and Wilson outside. J. saw, as he put it, "somebody flipped us off." The sun was setting when they made the trip to the store, which was about 8:30 p.m. that night. It was dark outside when they got back to the house. Five to ten minutes

after their return, the group heard the sound of motorcycles approaching the neighborhood and revving their engines.

Roessler and [Oliver] rode past Lawrence's house and turned down a street behind the house, where they briefly stopped their motorcycles before turning around and riding past the house again.  Lawrence and most of his guests were outside the house when the motorcycles made their passes, including J., who threw a beer can at them as they drove by the first time.  E. was inside the house, but came outside when she heard the motorcycles and saw her husband opening the electronic gate separating the driveway from the road.  She followed him into the road, making it out of the gate just before it closed behind her.  The riders parked their motorcycles in the street, facing away from the house.

Lawrence approached [Oliver] and said, "I told you motherfuckers earlier." [Oliver] responded: "You didn't tell me fucking shit."  As Lawrence came closer, [Oliver] swung his motorcycle helmet at him.  A fistfight between the men followed. When E. tried to intervene, [Oliver] hit her in the head with the helmet, knocking her to the ground.  As she got to her feet, E. saw her husband fighting with both [Oliver] and Roessler.  Roessler then lifted his shirt and pulled out the gun he brought with him, pointing it at Lawrence.  A., still in the front yard, saw the gun and yelled: "He has a gun, he has a gun."  Roessler fired two or three rounds, striking Lawrence in the left side of the neck, severing the jugular vein.  Lawrence fell to the ground immediately.  Roessler quickly returned to his motorcycle and rode away, followed by [Oliver].  A. called 911 while other members of Lawrence's group, including his wife, ran to his side.  Lawrence bled to death before emergency medical personnel arrived on the scene.

Back at the bar, Wilson and Delgado were getting into Delgado's van to leave when they heard gunshots.  Within a matter of seconds, Wilson saw Roessler "fly by" on his motorcycle.  As Wilson and Delgado were pulling onto the road in front of the bar, [Oliver] slowly approached on Roessler's motorcycle holding his stomach.  Delgado stopped the van and Wilson got out to find out what was going on.  [Oliver] was "bleeding profusely."  He had also been hit by at least one of the rounds Roessler fired at Lawrence; one bullet passed clean through his hand, while the same or another bullet struck him in the abdomen.  Wilson helped [Oliver] off of the motorcycle and into the van. Delgado then drove [Oliver] to the hospital.  Shortly after passing by the bar, Roessler crashed Wilson's motorcycle in a corn field when the road he was on came to a dead end.  He too was transported to the hospital and treated for injuries.

We finally note the .45-caliber handgun Roessler used to murder Lawrence was recovered from a ditch across the street from the Lawrence residence.  The gun had one live round in the chamber and two in the attached magazine.  DNA matching that of [Oliver] was found on the magazine.  An empty shell casing recovered near Lawrence's body was determined to have been fired by that gun.  Two motorcycle helmets, one of which had its visor broken off, were also found in front of the Lawrence residence.  DNA matching that of Roessler was found on the liner of one of the helmets.

*People v. Oliver*, No. C081847, 2019 WL 2710245, at *2-5 (Cal. Ct. App. Jun. 28, 2019).

At the conclusion of trial, the jury found Oliver guilty as charged.[4]  The trial court subsequently denied probation and sentenced Oliver to an aggregate term of 27 years to life imprisonment.  The court also ordered victim restitution in the amount of $836,567, to be paid jointly and severally with Roessler.

Through counsel, Oliver appealed his conviction, arguing that: 1) the prosecution presented insufficient evidence to support the jury's finding that Oliver conspired with Roessler to kill Lawrence; 2) the prosecution presented insufficient evidence to support the jury's finding that Oliver knew of Roessler's unlawful purpose and acted with the intent to encourage or facilitate Lawrence's murder; 3) the trial court erred in denying Oliver's request to instruct the jury that Wilson was an accomplice as a matter of law; 4) the trial court abused its discretion in admitting text messages about Wilson's attempt to purchase a gun on the day of the murder; 5) the prosecutor committed misconduct by arguing facts not in evidence; 6) trial counsel rendered ineffective assistance by failing to object to the prosecutor's claim that Oliver held Lawrence so that Roessler could shoot him; 7) the prosecutor committed misconduct by arguing inadmissible character evidence as a reason to convict Oliver; 8) the prosecutor committed misconduct by disparaging defense counsel and Oliver, misrepresenting the evidence, and improperly appealing to the jury's passion and prejudice; 9) the trial court abused its discretion in awarding restitution; and 10) the procedure for ordering restitution for lost future spousal support violated Oliver's rights to due process and equal protection.  The California Court of Appeal unanimously affirmed the judgment against Oliver in a reasoned, unpublished opinion

---

[4]     Roessler was convicted of second-degree murder and acquitted of conspiracy to commit murder.  Wilson was acquitted of murder and conspiracy but convicted of various weapons charges.

6

issued on June 28, 2019. *Oliver*, 2019 WL 2710245, at *19.  Oliver petitioned in the California

Supreme Court for review of all claims unsuccessfully raised before the Court of Appeal, which

was denied without comment on October 9, 2019.

Oliver then filed in the Superior Court and the Court of Appeal, respectively, two

collateral actions seeking post-conviction sentencing leniency under California law, both of

which were denied.  Oliver also filed in the Superior Court a *pro se* petition for habeas relief.  In

that petition, Oliver argued that appellate counsel was ineffective for failing to file a separate

notice of appeal as to the trial court's order of direct victim restitution.  The Superior Court

denied the petition in a reasoned, unpublished opinion on July 15, 2020, concluding that, even

assuming that counsel was required to file a separate notice of appeal to render the restitution

challenge cognizable on state habeas review, Oliver failed to show that he would have prevailed

on the issue had it had been properly raised.

While his state habeas petition was pending, Oliver timely filed in this Court an undated

*pro se* Petition for a Writ of Habeas Corpus in this Court, which was docketed on May 15, 2020.

Docket No. 1; *see* 28 U.S.C. § 2244(d)(1),(2).  Oliver then filed an Amended Petition, Docket

No. 7 ("Petition"), which Respondent answered, Docket No. 14.  Briefing on this case is now

complete, and the matter is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Oliver argues, as he did before the state courts on

direct appeal, that: 1) the prosecution presented insufficient evidence to support the jury's

finding that Oliver conspired with Roessler to kill Lawrence; 2) the prosecution presented

insufficient evidence to support the jury's finding that Oliver knew of Roessler's unlawful

purpose and acted with the intent to encourage or facilitate Lawrence's murder; 3) the trial court erred in denying Oliver's request to instruct the jury that Wilson was an accomplice as a matter of law; 4) the trial court abused its discretion in admitting text messages about Wilson's attempt to purchase a gun on the day of the murder; 5) the prosecutor committed misconduct by arguing facts not in evidence; 6) trial counsel rendered ineffective assistance by failing to object to the prosecutor's claim that Oliver held Lawrence so that Roessler could shoot him; 7) the prosecutor committed misconduct by arguing inadmissible character evidence as a reason to convict Oliver; and 8) the prosecutor committed misconduct by disparaging defense counsel and Oliver, misrepresenting the evidence, and improperly appealing to the jury's passion and prejudice.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a common term in the legal world.  The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating

8

whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication

on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under

the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v.

Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.    <u>*Insufficiency of the Evidence*</u> (Grounds 1, 2)

Oliver first argues that the evidence presented was legally insufficient to sustain his

convictions for conspiracy and first-degree murder.  According to Oliver, the evidence failed to

prove that: 1) he made a deliberate decision to aid and abet intentional murder; and 2) conspired

to commit murder.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for

sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the

original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This

Court must therefore determine whether the California court unreasonably applied *Jackson*.  In

making this determination, this Court may not usurp the role of the finder of fact by considering

how it would have resolved any conflicts in the evidence, made the inferences, or considered the

evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical

facts that supports conflicting inferences," this Court "must presume–even if it does not

affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should

11

be drawn from evidence admitted at trial." *Id.* Under *Cavazos*, "a federal court may not

overturn a state court decision rejecting a sufficiency of the evidence challenge simply because

the federal court disagrees with the state court. The federal court instead may do so only if the

state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766,

773 (2010)).

In support of his claims, Oliver argues that: 1) his fistfight with the victim showed that he

intended no shooting because the fight put him in the line of fire; 2) phone records showing no

calls from Wilson to Oliver indicated that Wilson was lying about calling Oliver to relay

Roessler's request to bring Roessler a gun; and 3) documentary evidence and Roessler's

testimony regarding when the argument at the bar took place indicated that Oliver offered to arm

Roessler before the altercation at the bar took place. But all of the evidence in support of his

claim was before the jury for its assessment. This Court is precluded from re-weighing the

evidence or re-assessing witness credibility. *Schlup*, 513 U.S at 330; *Bruce v. Terhune*, 376 F.3d

950, 957-58 (9th Cir. 2004). As the Court of Appeal explained:

> In this case, there was strong evidence [Oliver] aided and abetted Roessler in
> committing a first degree murder. With respect to motive, Wilson testified Roessler was
> frustrated by the confrontation with Lawrence and irritated he was pushed by a woman
> outside the bar. After that confrontation, some of the bar's patrons suggested Lawrence
> might come back with more people, further aggravating Roessler. Several minutes later,
> Roessler told Wilson to call [Oliver] to ask whether he would be bringing the gun
> Roessler had previously asked [Oliver] to bring to the bar. During that conversation,
> Wilson told [Oliver] about the confrontation with Lawrence. Thus, while it is unclear
> whether the conversation between Roessler and [Oliver], in which Roessler initially
> asked for the gun, occurred before or after the confrontation with Lawrence, the jury
> could have reasonably inferred the 8:03 p.m. text message from [Oliver] to Roessler
> asking, "You want some heat[?]" was sent after he learned of that confrontation from
> Wilson. Roessler responded: "Ya[.]" A further reasonable inference is that whereas
> Roessler's anger and frustration following the confrontation supplied him with motive to
> murder Lawrence (*see, e.g.*, *People v. Wright* (1985) 39 Cal.3d 576, 593 [jury could
> reasonably infer a confrontation with the victim provided the defendant with motive to

murder him in retaliation]), [Oliver's] friendship with Roessler supplied him with motive to help him do so.  (*See People v. Nguyen* (1993) 21 Cal. App. 4th 518, 534 [an aider and abettor "might act out of friendship with the perpetrator"].)

 With respect to planning, in addition to Roessler asking [Oliver] to bring him a gun, in a text message exchange between [Oliver] and Wilson, [Oliver] confirmed with Wilson that Roessler wanted him to bring a gun to the bar, after which [Oliver] said he was on his way and provided both Wilson and Roessler with updates as to his estimated time of arrival.  When [Oliver] arrived, he handed Roessler a loaded .45-caliber handgun. The two then discussed the confrontation, after which they rode into the neighborhood where Lawrence lived. Roessler did not know Lawrence's address, only that he lived in the area.  So Roessler and [Oliver] revved their engines as they rode through the neighborhood.  A reasonable jury could have inferred they did so in order to announce their presence in the hope that Lawrence would come out to confront them.  That is exactly what happened.  As in *People v. Wright*, *supra*, 39 Cal.3d 576, obtaining a loaded firearm and seeking out the victim constitutes evidence of planning activity from which the jury could reasonably find premeditation.  (*Id.* at pp. 592-593.)

 Finally, with respect to manner of killing, shooting Lawrence at close range with a large caliber handgun "could well support an inference by the jury that the manner of killing was 'particular and exacting.'"  (*People v. Wright*, *supra*, 39 Cal.3d at p. 594.) Based on the foregoing evidence, a reasonable jury could have concluded beyond a reasonable doubt that Roessler murdered Lawrence with premeditation and deliberation and [Oliver], knowing of Roessler's intent and possessing the same mental state, aided and abetted him in doing so.

*Oliver*, 2019 WL 2710245, at *7.

As the appellate court further explained, "The evidence supporting defendant's first degree murder conviction is also adequate to support his conviction for conspiracy to commit murder." *Id.* at *8.

Although it might have been possible to draw a different inference from other evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Oliver bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  He has failed to carry such burden. For the reasons persuasively stated by the Court of Appeal, the record does not compel the conclusion that no rational trier of fact could have found that Oliver intended to aid and abet

13

first-degree murder and entered an agreement to do so, especially considering the double

deference owed under Jackson and AEDPA.  *See Valdez v. Clark*, 587 F. App'x 414, 414-25 (9th

Cir. 2014).  Oliver is therefore not entitled to relief on either of his legal insufficiency claims.

B.      *Evidentiary Error* (Ground 3)

       Oliver next contends that the trial court erred "when it admitted inflammatory and

prejudicial hearsay about Justin Wilson's attempt to purchase a .32 handgun."  Petition at 8.  The

Court of Appeal considered and rejected this claim on direct appeal as follows:

### A.
### Additional Background

       The challenged text messages were sent over the span of about 20 minutes around
4:00 p.m. the day Lawrence was murdered.  In the exchange, Wilson asked Roessler to
tell [Oliver] to "get that 32," referring to a .32-caliber firearm he wanted to buy from
[Oliver].  Roessler responded by pretending he had already purchased the weapon from
[Oliver].  Wilson replied: "Son of a bitch was spose to sell it to me[.]"  [Oliver] then sent
a text message to Wilson, also pretending he sold the gun to Roessler.  [Oliver] and
Wilson also discussed a previous unsuccessful gun sale between Wilson and Roessler in
which Roessler wanted $140 as a down payment but Wilson could only come up with
$100.  [Oliver] told Wilson he sold the .32-caliber firearm to Roessler because Roessler
told him he was selling it to Wilson for $140.  Wilson responded: "Yea I want the 32 but
he nvr sed anything about it[.]"
       The trial court admitted the challenged evidence over defense counsel's
objections that the text messages were inadmissible hearsay and amounted to improper
character evidence, explaining the statements made in the messages (1) were admissible
under the exception to the hearsay rule for admissions of co-conspirators, and (2) were
admissible under Evidence Code section 1101, subdivision (b), "to show . . . motive,
identity, opportunity, intent, preparation, common plan or design.  In other words, they
were planning on getting guns from [Oliver] for some other purpose, and that was just
three hours, maybe four hours before this incident with the victim.  [¶]  So it's very, very
close in time, and I think it's extremely relevant to show that they were predisposed to
obtain firearms, and then when they needed a firearm to carry out the conspiracy to kill
[Lawrence], that they knew that [Oliver] could provide a firearm, and then with greater
urgency they wanted to obtain one and did."  The trial court also ruled the evidence was
admissible under Evidence Code section 352.

### B.
### Analysis

[Oliver] challenges the trial court's ruling only with respect to admissibility under the co-conspirator exception to the hearsay rule.

With many exceptions, hearsay evidence, *i.e.*, "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated," is inadmissible. (Evid. Code, § 1200.) "Under this definition, as under existing case law, a statement that is offered for some purpose other than to prove the fact stated therein is not hearsay." (Sen. Com. on Judiciary, com., reprinted at 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1200, p. 3.) One of the exceptions to the hearsay rule is for statements made by a co-conspirator in furtherance of the objective of the conspiracy. (*See* Evid. Code, § 1223.)

[Oliver] argues the challenged statements are hearsay and did not fall within the above exception to the hearsay rule. The Attorney General argues the statements are not hearsay at all because they were not offered to prove the truth of the statements. We agree with the Attorney General and do not address the co-conspirator exception.

Roessler's statement to Wilson that he bought the .32-caliber gun from [Oliver] was not offered to prove Roessler did in fact buy the gun. Similarly, [Oliver's] statement to Wilson that Roessler "came and got [the gun] for you" was not offered to prove Roessler actually bought the gun from [Oliver] in order to sell it to Wilson. It appears both [Oliver] and Roessler were teasing Wilson with these statements. So too with respect to Wilson's statements to both Roessler and [Oliver] indicating he wanted the gun ("get that 32" and "I want the 32") and his statement to Roessler indicating [Oliver] had agreed to sell him the gun ("Son of a bitch was spose to sell it to me"). As the Attorney General points out, these statements were not offered for their truth, *i.e.*, Wilson in fact wanted the gun or that[Oliver] in fact agreed to sell it to him; instead, the "inquir[y] about obtaining a gun from [Oliver]" hours before the murder was offered to establish circumstantially "that Wilson and Roessler believed [Oliver] had access to guns" and could supply one to murder Lawrence. Such a belief tends in reason to make it more likely that was the reason they contacted him that night.

Indeed, this case is similar to cases in which phone calls are made inquiring about placing bets or purchasing narcotics and those inquiries are admitted not for their truth, *i.e.*, the caller in fact wanted to place a certain amount of money on a certain outcome or purchase a certain amount of drugs for a certain price, but to establish circumstantially that illicit use was being made of the location in question. (*See, e.g.*, *People v. Fischer* (1957) 49 Cal.2d 442, 447; *People v. Ventura* (1991) 1 Cal. App. 4th 1515, 1519; *People v. Nealy* (1991) 228 Cal. App. 3d 447, 450; *People v. Carella* (1961) 191 Cal. App. 2d 115, 139-140.)

Finally, we are left with the statements between Wilson and [Oliver] concerning Wilson's previous attempt to purchase a gun from Roessler. As mentioned, Wilson told [Oliver] the details of that attempted transaction, after which [Oliver] told Wilson that Roessler told him Wilson was buying the .32-caliber gun from him for $140. While the latter statement contains two layers of potential hearsay, as with the other statements analyzed above, we conclude none of these statements were offered for their truth. Instead, as the Attorney General argues, the statements were offered to establish that

15

Roessler and Wilson "did not contact [Oliver] for the innocent purpose of coming to the bar to have drinks."

The trial court neither abused its discretion nor violated [Oliver's] constitutional rights in admitting the challenged statements into evidence.

*Oliver*, 2019 WL 2710245, at *10-12.

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted). A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

Oliver fails to satisfy these high standards with respect to his evidentiary error claim. As an initial matter, to the extent he re-raises here his direct appeal claim challenging the state

courts' determination that California Evidence Code § 1223[5] applied, such claim presents only

an error of state law that is not cognizable on federal habeas review.  Again, federal habeas relief

is available only for violations of the Constitution, treaties or laws of the United States, and any

claim alleging § 1223 error is not a proper basis for federal habeas relief.  *See* 28 U.S.C. §

2254(a); *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) ("[I]t is only noncompliance with *federal*

law that renders a State's criminal judgment susceptible to collateral attack in the federal

courts.").  "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief

unless federal constitutional rights are affected."  *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir.

1987).  Oliver's challenge to the trial court's evidentiary ruling raises no federal question

because "alleged errors in the application of state law are not cognizable in federal habeas

corpus."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Cooper v. Brown*, 510

F.3d 870, 1001 (9th Cir. 2007) (claim of evidentiary error "fails to present a federal question

cognizable on federal habeas review").

Nor is Oliver entitled to relief on his related claim that the trial court's ruling violated

California Evidence Code § 352.  Federal Rule of Evidence 403, the federal counterpart to§ 352,

permits the exclusion of evidence if its probative value is "substantially outweighed by a danger

of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in

determining the admissibility of evidence under the Federal Rules.  Assessing the probative

value of [the proffered evidence], and weighing any factors counseling against admissibility is a

---

[5]     That section authorizes evidence of a "statement . . . made prior to or during the
time that the party was participating in that conspiracy."  CAL. EVID. CODE § 1223(b).

matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence."). In his Petition, Oliver argues that the trial court erred in its balancing of evidence under Evidence Code § 352. But to the extent that he argues that the admission violated state law, Oliver is not entitled to habeas relief. *See Wilson v. Corcoran*, 562 U.S. 1, 4 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); *Estelle*, 502 U.S. at 67-68.

Moreover, Oliver cannot show that the admission violates federal due process. "'The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.'" *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)); *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991) (proper analysis on federal habeas review is "whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair"). "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101 (9th Cir. 2009). "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (citing *Williams*, 529 U.S. at 375). Absent such "clearly established Federal law," it cannot be concluded that the appellate court's ruling was an "unreasonable application."

*Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a

claim, a federal court cannot find a state court ruling unreasonable).  Oliver is therefore not

entitled to relief on any argument advanced in support of this ground.

C.      *Instructional Error* (Ground 4)

Oliver additionally avers that the trial court erred by declining to instruct the jury that

Wilson was an accomplice as a matter of law.  The Court of Appeal laid out the following factual

background to this claim:

> After both sides rested, defense counsel requested that the trial court instruct the
> jury with CALCRIM No. 335.  This instruction, titled, "Accomplice Testimony: No
> Dispute Whether Witness Is Accomplice," would have informed the jury that if the
> charged crimes were committed, Wilson was an accomplice to those crimes.  (CALCRIM
> No. 335.) The instruction would then have  informed the jury how to evaluate the
> testimony of an accomplice.  (*Ibid.*)
>
> Rather than provide this instruction, the trial court instructed the jury with
> CALCRIM No. 334, titled, "Accomplice Testimony Must Be Corroborated: Dispute
> Whether Witness Is Accomplice."  (CALCRIM No. 334.)  This instruction also informed
> the jury how to evaluate accomplice testimony, but began by stating: "Before you may
> consider the statement or testimony of Justin Wilson as evidence against the defendant
> regarding the [charged crimes], you must decide whether [Wilson] was an accomplice to
> those crimes.  [¶]  A person is an accomplice if he is subject to prosecution for the
> identical crime charged against the defendant.  Someone is subject to prosecution if, one,
> he personally committed the crime; or, two, he knew of the criminal purpose of the
> person who committed the crime; and, three, he intended to and did, in fact, aid,
> facilitate, promote, encourage, or instigate the commission of the crime, or participate in
> a criminal conspiracy to commit the crime.  The burden is on the defendant to prove that
> it is more likely than not that Justin Wilson was an accomplice.  [¶]  An accomplice does
> not need to be present when the crime is committed.  On the other hand, a person is not
> an accomplice just because he is present at the scene of a crime, even if he knows that a
> crime will be committed or is being committed and does nothing to stop it."  (*Ibid.*)
>
> In choosing CALCRIM No. 334 as the appropriate instruction, the trial court
> explained: "I don't think you can say as a matter of law that Justin Wilson is an
> accomplice," noting, "he was found not guilty and the jury knows he was found not
> guilty.  So I think we should give [CALCRIM No.] 334.  And the jury will decide
> whether he's an accomplice or not."

*Oliver*, 2019 WL 2710245, at *9.

Oliver now argues, as he did on direct appeal, that the trial court should have instructed the jury that Wilson was an accomplice as a matter of law.  The Court of Appeal disagreed, reasoning:

> Wilson's status as an accomplice was neither clear nor undisputed.  He may well have been, and was charged with the identical offenses in a separate trial.  However, that alone does not establish him to be an accomplice as a matter of law any more than the acquittal in that previous trial would have prevented the jury from finding him to be an accomplice for purposes of evaluating his testimony in this one.  It was for the jury to determine whether or not Wilson was an accomplice.  The trial court did not err in so instructing the jury.

*Id.* at *10 (citation omitted).

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

20

that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

To the extent Oliver claims that the state courts erred in determining that Wilson was not an accomplice under California law, he is not entitled to habeas relief.  The Court must defer to the state courts' finding on this state law issue.  *Estelle*, 502 U.S. at 67-68.  Moreover, California's requirement that accomplice testimony be corroborated is a *state law* requirement; the Supreme Court has never clearly held that such requirement exists under Federal law.  *See also Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (California Penal Code § 1111 "is a state law requirement that a conviction be based on more than uncorroborated accomplice testimony. . . . As a state statutory rule, and to the extent the uncorroborated testimony is not 'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal law.) (citations omitted); *Takacs v. Engle*, 768 F.2d 122, 127 (6th Cir. 1985) ("If uncorroborated accomplice testimony is sufficient to support a conviction under the Constitution, there can be no constitutional right to instruct the jury that it must find corroboration for an accomplice's testimony."); *Jones v. Uribe*, 2013 WL 6050381, at *7 (C.D. Cal. Nov. 11, 2013) ("The Court finds no constitutional error with respect to the state courts' determination of the accomplice testimony issue.... [T]he issue of corroborating an alleged accomplice is a matter of state statutory law that raises no federal question. The failure to give the requested instruction here cannot, on its own, violate the Constitution.").  Accordingly, Oliver is not entitled to relief on this ground.

D.   _Prosecutorial Misconduct_ (Grounds 5-8)

Finally, Oliver claims that the prosecutor committed misconduct by: 1) arguing facts not in evidence; 2) misrepresenting the record; 3) arguing Oliver's bad character; 4) disparaging Oliver and defense counsel; and 5) appealing to the jury's passion and prejudice.

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." _Darden v. Wainwright_, 477 U.S. 168, 171 (1986) (quoting _Donnelly v. DeChristoforo_, 416 U.S. 637, 643 (1974)); _see Bonin v. Calderon_, 59 F.3d 815, 843 (9th Cir. 1995).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  _Greer v. Miller_, 485 U.S. 756, 765 (1987) (quoting _United States v. Bagley_, 473 U.S. 667 (1985)).  Under this standard, a petitioner must show there is a reasonable probability the error complained of affected the outcome of the trial—_i.e._, that absent the alleged impropriety, the verdict probably would have been different.

None of Oliver's contentions satisfy this heavy burden.  With respect to the first two arguments advanced in support of this claim, it is true that a prosecutor may not misstate the evidence or refer to facts not in evidence.  _Darden_, 477 U.S. at 181-82; _Berger v. United States_, 295 U.S. 78, 84-85 (1935) (holding that prosecutor "overstepped the bounds of . . . propriety and fairness" by "misstating the facts in his cross-examination of witnesses; . . . putting into the mouths of such witnesses things which they had not said; . . . suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; . . . [and] assuming prejudicial facts not in evidence").  But again, a habeas petition alleging prosecutorial misconduct will be granted only when the misconduct did "so infect the

23

trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Oliver fails to demonstrate fundamental unfairness here. As the Court of Appeal reasonably concluded on direct appeal when rejecting Oliver's argument that the prosecutor argued facts not in evidence, the prosecutor was free to "ask[] the jury to consider whether or not [Oliver] was 'positioning' Lawrence so that Roessler could more effectively shoot him, and therefore argue[] the manner in which Lawrence was shot did not make sense unless [Oliver] was restraining him when Roessler fired." *Oliver*, 2019 WL 2710245, at *13. As the appellate court recognized, rather than arguing facts not in evidence, the prosecutor expressed her "right to fully state [her] views as to what the evidence shows and to urge whatever conclusions [she] deemed proper." *Id.* (citation omitted). Likewise, the record does not support that the prosecutor misrepresented the record. Rather, although Oliver points to competing evidence in the record, "there was evidence in the record supporting the prosecutor's argument that Lawrence did not instigate any violence the day he was murdered." *Id.* at *14. Accordingly, this Court cannot say that the state court's resolution of this claim was unreasonable or that the prosecutor's remarks in these regards deprived Oliver of a fair trial.

Oliver next contends that the prosecutor impermissibly urged the jury to convict him as "a person of bad character who associated with persons of bad character." *Id.* at *15. In considering this claim on direct appeal, the Court of Appeal conducted a painstaking line-by-line

24

review of the prosecutor's comments before concluding that certain "comments crossed the line into asking the jury to draw impermissible inferences based on [Oliver's] character." *Id.* at *17. The appellate court nonetheless concluded:

> The only misconduct revealed by our review of the prosecutor's arguments are her brief references to [Oliver's] "people," the unrelated weapons carried by [Oliver] and Wilson the night of the murder, and the unrelated firearms [Oliver] possessed at his house. While we do not take these comments lightly, we conclude they "would not have affected the outcome or fairness of the trial in light of the overwhelming evidence of guilt introduced by the prosecution and [Oliver's] own testimony."

*Id.* at *19 (citation omitted).

The Court of Appeal's conclusion is both reasonable and fully supported by the record, which reflects that the prosecutor's challenged comments were isolated rather than extensive. *See Trillo v. Biter*, 769 F.3d 995, 1002 (9th Cir. 2014) (prosecutor's misstatement about reasonable doubt did not play a prominent role in the trial when it "was a single statement during a closing argument that took twenty pages of transcript after a long criminal trial"). Moreover, given the weight of the evidence, it is unlikely that the prosecutor's brief improper statements affected the outcome of the trial. *See Darden*, 477 U.S. at 196 (reasoning that overwhelming evidence of guilt "reduced the likelihood that the jury's decision was influenced by" the prosecutor's improper argument). Oliver is therefore not entitled to relief on this contention either.

Oliver further argues that the prosecutor disparaged both himself and defense counsel. But the record fully supports the Court of Appeal's conclusion that the challenged "comments were directed towards Wilson's former defense attorney, who testified as a defense witness, not [Oliver's] trial counsel," *Oliver*, 2019 WL 2710245, at *18. Moreover, a reasonable jurist could conclude that the comments were directed at the strength of the defense on the merits and did not

amount to an improper disparagement of defense counsel.  *See United States v. Ruiz,* 710 F.3d 1077, 1086 (9th Cir. 2013) (prosecution's characterization of defense's case as "smoke and mirrors" was not improper where comment was directed to strength of the case and was not an *ad hominem* attack on defense counsel) (citation omitted); *People v. Stitely*, 108 P.3d 182, 212-13 (Cal. 2005) (prosecutor's use of "colorful language" to criticize "counsel's tactical approach" was not improper where the comments were "explicitly aimed at counsel's closing argument and statement, rather than at him personally").

Finally, Oliver claims that the prosecutor improperly appealed to the jury's passion and prejudice.  The Court of Appeal rejected that claim as follows:

> [T]hese comments were directly responsive to arguments made by defense counsel during his closing argument.  The "feared" comment was in response to defense counsel's statement that the prosecutor was using a "ploy" to convict him of murder, by overcharging him with murder rather than with the assault he admitted committing on Lawrence, adding: "They don't want you to find him guilty of what he did. [¶] . . . We want you to find him guilty of murder.  And if you don't find him guilty of murder, then live with your conscience and let a guilty man go."   The prosecutor's comment about Lawrence's daughter was also in response to defense counsel's statement: "[Lawrence's daughter] is going to grow up without a father.  I can't imagine what it's like."  Viewing the prosecutor's comments in their totality, the prosecutor told the jury to not allow defense counsel's argument to prevent them from doing their duty, *i.e.*, applying the law to the facts and determining whether or not [Oliver] committed murder.  The prosecutor also asked the jury to do so without considering any sympathy they might have for Lawrence's daughter.  This was not misconduct.

*Oliver*, 2019 WL 2710245, at *18.

Again, the Court of Appeal's determination of this claim is both reasonable and fully supported by the record, and relief is foreclosed here.  In sum, Oliver is not entitled to relief on any of the arguments advanced in support of his prosecutorial misconduct claim.

## V. CONCLUSION AND ORDER

Oliver is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 14, 2021.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
